WILFRED LAMBERT *vs*. FRIDOLIN BRETON.

Androscoggin.     Opinion February 23, 1929.

*Herbert E. Holmes*, for plaintiff.
*Belleau & Belleau*, for defendant.

SITTING: WILSON, C. J., PHILBROOK, DUNN, BARNES, PATTANGALL, JJ.

PHILBROOK, J.    About the middle of February, 1927, the plaintiff became a tenant at will of the defendant in a building to be used as a cobbler's shop. Monthly rental of thirty-five dollars was agreed upon. Rent for the balance of February was paid at the close of that month, and apparently, by tacit understanding of the parties, rent day was established as the last day of each month. The agreed rental was paid for the months of March, April and May. During the week of July 4 the landlord called at the shop to collect the June rental. On being told by the tenant that he had not sufficient funds on hand to pay the rent in full, but would make part payment, the landlord replied that if the tenant could not pay the whole sum he should go to his attorney "and see that he would get it." A day or two later a deputy sheriff called, having a civil precept bearing date of July 7, 1927, containing an indebitatus assumpsit count as follows:

"Lewiston, Maine, July 7, 1927.

Wilfred Lambert
To Fridolin Breton, Dr.

1927, July 7, To balance due for use and occupation of store at No. 325 on Lisbon Street in Lewiston, Me.          $70.00"

According to Lambert's testimony, the following colloquy took place between him and the deputy sheriff:

"He came into the shop about nine o'clock in the forenoon, said 'Hello' and I answered him. He says, 'I am sorry but I have got to lock the place up.' 'Now,' he says, 'if you want to you can give me your keys,' and he says, 'in doing so we wont have to put any locks on the outside of the store. It wont show you have been closed up by the sheriff.' Not knowing the law I gave him my keys, took my coat and went out. He locked the doors."

The officer's return upon his precept was that on July 7, 1927, he attached a chip, and a second return that on the same day he attached the stock and fixtures of the shoe repairing shop.

Only one key was given to the deputy sheriff but the tenant had another key to the same door and on the morning following the above incident he opened the shop and went about his work as usual.

On July 9, 1927, the same deputy sheriff called at the shop, having another writ dated July 9, 1927, containing the same indebitatus count as that found in the former precept, but with an omnibus count added, and on this second writ the return showed that on July 13, 1927, the officer attached "the 'shoe repairing shop" of Lambert. According to Lambert's testimony, the officer had no one with him when he first came on July 9. The following testimony of Lambert is taken from the record:

"That Saturday when he came to the store he was alone the first time. He ordered me out. Told me he was going to put the locks on. I told him I wouldn't go out and refused to go out; and we talked. Both of us got hot-headed a little and I don't remember the conversation but finally he went out and came back with a keeper."

The officer told Lambert that the keeper was going to stay and take possession of the place. About two hours later, the deputy came back and gave Lambert a written notice, signed by the attorneys for Breton, informing him that the action begun on July 7 was thereby discontinued. Lambert continued to work in the shop until a late hour that night. Nothing further happened until Tuesday morning when Lambert came to the shop, intending to resume work, but found padlocks on both front and back doors. He went to see the attorneys for Breton but obtained no satisfaction. The shop remained locked with the sheriff's lock until August 30 when certain persons who had mortgages on its contents were permitted to remove the same, and Lambert was permitted to remove his property, such as tools and stock which were exempt from attachment. No notice to quit was ever served on Lambert but after the padlocks were placed on the doors he rented another shop in which to carry on his business.

On September 17, 1927, Lambert commenced the action at bar. Jury trial was begun and at the close of plaintiff's testimony the presiding justice granted defendant's motion for a non-suit. The case is before us on exceptions to that ruling.

The record does not disclose the grounds upon which motion for

non-suit was based, nor the reasons for granting the same as they existed in the mind of the presiding justice — hence a more general discussion of the case seems to be required.

By observing the allegations in the plaintiff's declaration, it will be seen that the action is for an abuse of legal process in a civil suit. It is a rule of law of very general recognition that an action will lie for an abuse of such process. *Nix* v. *Goodhill*, 95 Ia., 282; 63 N. W., 701; 58 A. S. R., 434. If process, either civil or criminal, is wilfully made use of for a purpose not justified by the law, this is an abuse for which an action will lie. Cooley on Torts, 2nd edition, p. 220.

The general right to an action is not to be seriously questioned, but the more difficult question is, what is an abuse of process, so as to render it actionable. Before attempting to answer the question by definition, we should be careful to observe a distinction between suing out a writ and the improper use of the writ after it is issued. In *Bartlett* v. *Christhilf*, 69 Md., 219; 14 Atl., 518; the court said: "There are instances in which the writ, regularly and properly sued out, was perverted, abused, and made an instrument of oppression. Either something not warranted by its terms, or something in excess of that which was warranted was done under it. It would, indeed, be a serious reproach to the law, if in such cases it afforded no remedy or redress to the injured party. The denial of a remedy in such cases, upon the ground that the law was incapable of affording redress, would be a most serious reflection upon the remedial efficacy of any system of jurisprudence. It would proclaim to the evil disposed an unrestricted license to vex, harass, and injure without accountability, even though their victims should be utterly ruined in their circumstances."

To resort to definition, we use the words most frequently quoted by law writers and courts, found in 2 Addison on Torts, Section 868, "whoever makes use of the process of the court for some private purpose of his own, not warranted by the exigency of the writ or the order of the court, is answerable to an action for damages for an abuse of the process of the court."

In Ruling Case Law, Vol. 1, page 102, we read that "Abuse of legal process consists in the malicious misuse or misapplication of that process to accomplish some purpose not warranted or com-

,manded by the writ. In brief, it is the malicious perversion of a regularly issued process whereby a result not lawfully or properly attainable under it is secured"; citing several authorities.

It will be observed that Addison, *supra*, omits the word "malicious," but the authorities are strong, if not quite uniform, that the unlawful use of the process must be malicious and without probable cause; the rule being akin, in that respect, to actions for malicious prosecution.

But we must not overlook the difference between actions for abuse of process and actions for malicious prosecution, lest confusion arise, as seems to have occurred in some instances. The distinctive nature of an action for malicious abuse of process, as compared with an action for malicious prosecution, is that it lies for the improper use of process after it has been issued, not for maliciously causing process to issue. Note to *Pittsburg etc. R. Co.* v. *Wakefield Hardware Co.*, 3 Am. and Eng. Cas., at p. 722. In an action for malicious prosecution, a legal termination of the prosecution claimed is essential, but in an action for abuse of legal process, it is not necessary to aver and prove that the action in which the process issued has terminated. *Gordon* v. *West*, 129 Ga., 532; 59 S. E., 232; 13 L. R. A. (N. S.), 549.

While the precise requisites of an action for abuse of process have not been very clearly pointed out by court decisions nor law writers, yet it would seem, both from such authorities as we have examined and from reason, that to sustain the action these two elements are essential: (1) the existence of an ulterior motive, and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge. The first of these elements may, perhaps, be inferred from the second, but existence of the first cannot, in reason, dispense with proof of the second; for if the act of the prosecutor be in itself regular, the motive, ulterior or otherwise, is immaterial. *Bonney* v. *King*, 201 Ill., 47; 66 N. E., 377; *Keithley* v. *Stevens*, 238 Ill., 199; 87 N. E., 375; 128 A. S. R., 120. The test is, probably, whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral thing which he could not legally be compelled to do. *Johnson* v. *Reed*, 136 Mass., 421; *Docter* v. *Riedel*, 96 Wis., 158; 65 A. S. R., 40.

Another element in the case may be briefly referred to; namely, whether this defendant should be personally held to answer for the wrongs of which the plaintiff makes complaint.

One who places in the hands of an officer a valid writ without directions as to the manner of service is not liable for trespasses and lawlessness of the officer in the execution of the writ except where he, with knowledge of the facts, advises or assists in an abuse of the process, or subsequently ratifies the officer's acts. *Murray* v. *Mace,* 41 Nebraska, 60; 59 N. W., 387; 43 A. S. R., 664; *Wood* v. *Graves,* 144 Mass., 365; 11 N. E., 567; 59 Am. Rep., 95.

An attorney or agent may be held liable for an abuse of process where the acts complained of are his own personal acts or the acts of others wholly instigated and carried on by him.

See note in 86 A. S. R., at p. 409.

The record seems to disclose, among other things, (a) that Breton sued out an attachment greatly in excess of the debt, which according to Cooley, *supra,* was an abuse of legal process; (b) that Lambert was ordered out, locked out, and kept out of the shop, in other words he was compelled to do what the precept could not lawfully compel him to do. *Grainger* v. *Hill,* 4 Bing., N. C., 212, probably the most oft quoted case on this phase of the law; but (c) the outstanding proposition is that Lambert was evicted from his tenancy in a manner contrary to the provisions of R. S. Chap. 99, Sec. 2.

In view of the issues of fact disclosed, and the law governing the case, Lambert was entitled to have those issues of fact submitted to the jury under proper instructions.

*Exceptions sustained.*